## UNITED STATES DISTRICT COURT EASTERN DISTRICT OF TENNESSEE

## AT CHATTANOOGA

| | |
|---|---|
| BENJAMIN SMITH, Individually and on Behalf of All Others Similarly Situated, | Civil Action No. 1:19-cv-78 |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| U.S. XPRESS ENTERPRISES, INC., ERIC FULLER, ERIC PETERSON, JASON GREAR, MAX FULLER, LISA QUINN PATE, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, WELLS FARGO SECURITIES, LLC, STEPHENS INC., STIFEL, NICOLAUS & COMPANY, INCORPORATED and WR SECURITIES, LLC, | |
| Defendants. | DEMAND FOR JURY TRIAL |

### INTRODUCTION

Plaintiff Benjamin Smith ("Plaintiff"), by and through his undersigned attorneys, individually and on behalf of all other persons similarly situated, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the U.S. Securities and Exchange Commission ("SEC") filings by U.S. Xpress Enterprises, Inc. ("U.S. Xpress" or the "Company"), media and analyst reports about the Company, as well as information readily obtainable on the internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.  Plaintiff brings this action under §§ 11 and 15 of the Securities Act of 1933 (the "Securities Act"), on behalf of all persons and entities, other than Defendants (defined herein), who purchased or otherwise acquired the publicly traded common stock of U.S. Xpress pursuant and/or traceable to the Company's initial public offering completed in June 2018 (the "IPO") seeking to recover compensable damages caused by Defendants' violations of the Securities Act.

2.  This action asserts strict liability claims under §§ 11 and 15 of the Securities Act against U.S. Xpress, certain current and/or former U.S. Xpress officers and directors, and the underwriters of the IPO. These claims specifically exclude any allegations of fraud, knowledge, recklessness or scienter, do not "sound in fraud" and are based solely on strict liability and negligence.

3.  The claims in this action arise from the materially misleading Registration Statement and Prospectus (collectively the "Offering Documents"), defined *infra*, issued in connection with the IPO. In the IPO, Defendants offered and sold 16,668,000 shares of U.S. Xpress common stock to the public at a price of $16.00 per share. The Company received net proceeds from the IPO of approximately $245.2 million after deducting underwriting discounts and commissions and offering expenses.

4.  To the detriment of Plaintiff and all those that bought shares in or traceable to the IPO, the negligently prepared Offering Documents omitted material information regarding the Company's business prospects and financial health. As such, the Offering Documents contained untrue statements of material facts or omitted to state the facts necessary to make the statements made therein not misleading, thus violating the rules and regulations governing its preparation. Specifically, the Offering Documents failed to disclose:

(1) that a shortage of trucks was negatively impacting U.S. Xpress's dedicated division;

(2) that: (a) certain account shipping patterns had been performing differently than expected; and that, as a result (b) utilization and driver retention and hiring were being negatively affected; and that, as a result (c) U.S. Xpress's dedicated accounts, including one large account, were being negatively impacted; and that, as a result (d) U.S. Xpress's OTR division was providing continued support to the dedicated division;

(3) that: (a) U.S. Xpress failed to stay informed regarding two large liability events; and that, as a result (b) U.S. Xpress's insurance claim expense was understated;

(4) and that U.S. Xpress's cost per mile for driver wages and independent contractors was exceeding the Company's internal expectations.

5.      As a result of the foregoing, the statements contained in the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

6.      On November 1, 2018, U.S. Xpress issued a press release, also attached as exhibit 99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating results for the third fiscal quarter and nine months ending September 30, 2018. Therein, as well as during a conference call to discuss the results, U.S. Xpress disclosed how unusual shipping patterns were impacting its segments and how market challenges for drivers resulted in a year-to-year tractor count decrease. The Company and its executives also disclosed higher driver wages and independent contractor costs, lower than expected recruitment levels, and a higher insurance expense.

7.     On this news, the price of U.S. Xpress's common stock declined from a close of $10.14 per share on November 1, 2018 to a close of $7.10 per share on November 2, 2018, *a drop of approximately 29.98%.*

8.     At the date of the filing of this action, less than a year after the IPO, U.S. Xpress's common stock trades around $7.87 per share, *a decline of $8.13 per share or 50.81% from the $16 IPO public price*.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act, 15 U.S.C. §77v. In connection with the acts, conduct and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the U.S. mails, and interstate telephone communications.

10.     Venue is proper in this court pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v. The Company maintains its principal executive offices in this District. The dissemination of the materially false and misleading statements occurred in this District.

## PARTIES

### A.  Plaintiff

11.     Plaintiff Benjamin Smith purchased U.S. Xpress securities pursuant and/or traceable to the Company's Offering Documents for the IPO and was damaged thereby.

### B.  The Company

12.     Defendant U.S. Xpress is a publicly traded company incorporated in Nevada with its principal executive offices located at 4080 Jenkins Road, Chattanooga, Tennessee 37421.

4

Following the U.S. Xpress IPO, the Company's common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "USX."

**C. The Individual Defendants**

13.     Defendant Eric Fuller was, at all relevant times, the President, Chief Executive Officer ("CEO") and a director of U.S. Xpress. Defendant Eric Fuller signed or authorized the signing of the Registration Statemen filed with the SEC.

14.     Defendant Eric Peterson ("Peterson") was, at all relevant times, U.S. Xpress's Chief Financial Officer ("CFO"), Treasurer and Secretary. Defendant Peterson signed or authorized the signing of the Registration Statement filed with the SEC.

15.     Defendant Jason Grear ("Grear") was, at all relevant times, a Director of U.S. Xpress. Defendant Grear signed or authorized the signing of the Registration Statement filed with the SEC.

16.     Defendant Max Fuller was, at all relevant times, a Director of U.S. Xpress. Defendant Fuller signed or authorized the signing of the Registration Statement filed with the SEC.

17.     Defendant Lisa Quinn Pate ("Pate") was, at all relevant times, a Director of U.S. Xpress. Defendant Pate signed or authorized the signing of the Registration Statement filed with the SEC.

18.     Defendants Eric Fuller, Peterson, Grear, Max Fuller, and Pate are collectively referred to herein as the "Individual Defendants" and together with U.S. Xpress as the "Defendants."

19.     The Individual Defendants are strictly liable for the materially untrue and misleading statements contained in the Offering Documents. By virtue of their positions with the Company, the Individual Defendants possessed the power and authority to control the contents of

5

U.S. Xpress's Offering Documents, reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and market investors.

**D. The Underwriters Defendants**

20.    Under the terms and subject to the conditions in an underwriting agreement, the underwriters named below (the "Underwriter Defendants") severally agreed to purchase, and U.S. Xpress and certain pre-IPO stockholders agreed to sell to them, the number of shares indicated below, for which the Underwriter Defendants collectively were paid approximately $16.7 million in discounts and commissions, excluding exercise of any over-allotment option:

| Underwriter | Number of Shares |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | 5,348,644 |
| Morgan Stanley & Co. LLC | 5,348,664 |
| J.P. Morgan Securities LLC | 2,452,891 |
| Wells Fargo Securities, LLC | 2,452,891 |
| Stephens Inc. | 817,630 |
| Stifel, Nicolaus & Company, Incorporated | 817,630 |
| WR Securities, LLC | 817,630 |
| Total | 18,056,000 |

21.    Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") served as an underwriter for the IPO.

22.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the IPO.

23.    Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the IPO.

24.    Defendant Wells Fargo Securities, LLC ("Wells Fargo") served as an underwriter for the IPO.

25.    Defendant Stephens Inc. ("Stephens") served as an underwriter for the IPO.

6

26.     Defendant Stifel, Nicolaus & Company, Incorporated ("Stifel") served as an underwriter for the IPO.

27.     Defendant WR Securities, LLC ("WR") served as an underwriter for the IPO.

28.     The Underwriter Defendants are liable for the false and misleading statements in the Offering Documents. The Underwriter Defendants assisted the Defendants in planning the IPO and were required to conduct an adequate and reasonable investigation into the business and operations of U.S. Xpress — a process known as a "due diligence" investigation. The Underwriter Defendants were required to conduct a due diligence investigation in order to participate in the IPO. During the course of their investigation, the Underwriter Defendants had continual access to confidential corporate information concerning U.S. Xpress's operations and financial prospects.

29.     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with U.S. Xpress's lawyers, management and top executives and engaged in "drafting sessions" between at least March 2018 and May 2018. During these sessions, the Underwriter Defendants and the Defendants made joint decisions regarding: (i) the terms of the IPO, including the price at which U.S. Xpress shares would be sold to the public; (ii) the strategy to best accomplish the IPO; (iii) the information to be included in the Offering Documents; and (iv) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and U.S. Xpress's management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, U.S. Xpress's existing problems as alleged herein.

30.     The Offering Documents, including documents incorporated by reference, contained materially untrue and misleading statements and/or omissions. Defendants negligently

7

allowed the Offering Documents to contain materially untrue and misleading statements and/or omissions to the extent that they knew or should have known that the Offering Documents were materially misleading, but failed to act in a reasonable manner to prevent the Offering Documents from being disseminated.

31.     Plaintiff's claims brought under §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o are based solely on claims of strict liability and/or the absence of any affirmative defense based on the reasonableness of the pertinent Defendants' investigation into the true facts. These claims are not based on any allegation of fraud, intentional wrongdoing, or severe recklessness.

<h2 align="center">SUBSTANTIVE ALLEGATIONS</h2>

### A.     Background

32.     U.S. Xpress describes itself as the fifth largest asset-based truckload carrier in the U.S. by revenue. The Company provides services using both its own truckload fleet and third-party carriers. U.S. Xpress's fleet consists of more than 6,800 tractors and approximately 16,000 trailers.

33.     U.S. Xpress divides its services into two reportable segments: the truckload segment and the brokerage segment. The truckload segment consists of asset-based truckload services which includes over-the-road (sometimes referred to as "OTR") and dedicated contracts that as of March 31, 2018, represented 87% of U.S. Xpress's revenues. The brokerage segment consists of non-asset-based freight brokerage services and as of the same date, represented 12% of the Company's revenues.

34.     U.S. Xpress describes the over-the-road contracts as the transport of a trailer of freight for a single customer, pursuant to a short-term contract, operated by one or two drivers for

a route between 450 and 1,050 miles in length. Opposingly, the dedicated contracts are contractually assigned drivers and equipment in multi-year contracts designed for customers' needs.

35. On May 7, 2018, the U.S. Xpress filed a registration statement on Form S-1 with the SEC. The registration statement was subsequently amended, with the final amended registration statement on Form S-1/A filed on June 11, 2018 (collectively, the "Registration Statement"). The Registration Statement was declared effected by the SEC on June 13, 2018. U.S. Xpress filed its final prospectus with the SEC on June 15, 2018 (the "Prospectus").

36. In June 2018, U.S. Xpress completed its IPO. Defendants offered and sold 16,668,000 shares of U.S. Xpress common stock at a price to the public of $16.00 per share. The Company received net proceeds of approximately $245.2 million after deducting underwriting discounts, commissions, and offering expenses.

**B.  The Company Goes Public by Means of the Materially Misleading Offering Documents**

37. The Registration Statement, which was signed by each of the Individual Defendants, emphasizes the Company's "***improved performance***" due to "***asset optimization***":

**• Asset Optimization.**

    • In 2015, we began to redesign our fleet renewal and maintenance programs with the goal of improving reliability, reducing downtime for all tractors and reducing maintenance costs on the older tractors in our fleet. These initiatives, among others, were intended to improve the quality of our assets by purchasing, maintaining and trading our tractors in a manner designed to optimize life cycle costs.

    • In addition, in early 2016 we began enhancing our asset utilization by analyzing our consolidated Truckload and Brokerage freight demand using optimization software, allocating the most profitable freight to our Truckload assets and outsourcing the remainder to third-party carriers. With more loads to choose from, we have more options for improving the pricing and miles on our company tractor and trailer assets.

9

38.     Throughout the Registration Statement, Defendants also describe U.S. Xpress's growth strategy to "***capitalize on current favorable truckload environment***", stating in relevant part:

**Grow profitably as appropriate to the market cycle**

• Continue to leverage our service mix to manage through all market cycles

> • Grow our revenue base prudently with a focus on dedicated contract service and brokerage by cross-selling our services with existing customers and pursuing new customer opportunities

> • Maximize profitability for new freight across OTR and brokerage operations by selectively allocating freight to company assets

> • Seek favorable dedicated service contracts and brokerage freight to manage

• ***Capitalize on current favorable truckload environment***

> • ***Continue to secure rate increases in all of our service offerings***

> • ***Strategically expand our fleet based on expected profitability and driver availability, including through our company-sponsored independent contractor lease program (which has grown from zero drivers in the second quarter of 2017 to approximately 485 drivers at March 31, 2018)***

> • ***Leverage current market conditions to accelerate timeline for enhancement of network***

Emphasis added.

39.     The Registration Statement identifies U.S. Xpress's "***competitive strengths***" and emphasize a "***complementary mix of services to afford flexibility and stability.***" In relevant part:

***Complementary mix of services to afford flexibility and stability throughout economic cycles***

> Our service offerings have unique characteristics and are subject to differing market forces, which we believe allows us to respond effectively through economic cycles.

10

*OTR*

OTR business involves short-term customer contracts without pricing or volume guarantees that allow us to benefit from periods of supply and demand imbalance and price volatility. This is the largest part of our business and the overall truckload market, which is currently benefiting from strength in pricing and volumes described under "—Truckload Market."

*Dedicated*

Dedicated business features committed rates, lanes and volumes under contracts that generally afford us greater revenue predictability over the contract period and help smooth the impact of market cycles. Additionally, our dedicated contract service offering generally has higher driver retention rates than our OTR service offering, which we believe is because our professional drivers prefer the more predictable time at home that dedicated routes offer. In addition, this increased visibility allows us to commit and invest fleet resources with a more predictable return profile.

40. The Registration Statement further describes how the Company seeks to "***maintain flexibility through long-term enterprise planning***" by "***prioritizing growth in dedicated contract services.***" In pertinent part:

**Maintain flexibility through long-term enterprise planning and conservative financial policies**

• Maximize our free cash flow generation by managing expenses, taxes and capital expenditures

• Prioritize growth in dedicated contract services, which offers more predictable revenue streams and greater asset productivity

• Prioritize growth in brokerage, which requires limited capital investment and affords network-balancing freight volumes

• Monitor capital allocation to improve long-term return on invested capital

• Maintain a conservative leverage profile after this offering.

41. In the risks section, the Registration Statement describes certain risks related to high deductibles on claims exposure that "may" occur, stating in relevant part:

11

***We retain high deductibles on a significant portion of our claims exposure, which could significantly increase the volatility of, and decrease the amount of, our earnings and materially adversely affect our results of operations.***

We retain high deductibles on a significant portion of our claims exposure and related expenses associated with third-party bodily injury and property damage, employee medical expenses, workers' compensation, physical damage to our equipment and cargo loss. We retain a deductible of approximately $5.0 million per occurrence for automobile bodily injury and property damage through our captive risk retention group and up to $500,000 per occurrence for workers' compensation claims, both of which can make our insurance and claims expense higher or more volatile than if we maintained lower retentions. We are also responsible for the first $5.0 million aggregate in the $5.0 million to $10.0 million layer of excess insurance coverage for automobile bodily injury and property damage. Additionally, with respect to our third-party insurance, reduced capacity in the insurance market for trucking risks can make it more difficult to obtain both primary and excess insurance, can necessitate procuring insurance offshore, and could result in increases in collateral requirements on those primary lines that require securitization.

42.     To the detriment of Plaintiff and all those that bought shares in or traceable to the IPO, the negligently prepared Registration Statement omitted material information regarding the Company's business prospects and financial health. As such, the Registration Statement contained untrue statements of material facts or omitted to state the facts necessary to make the statements made therein not misleading, thus violating the rules and regulations governing its preparation.

43.     More specifically, the statements identified above were materially false and/or misleading because they failed to disclose:

(1) that a shortage of trucks was negatively impacting U.S. Xpress's dedicated division;

(2) that: (a) certain account shipping patterns had been performing differently than expected; and that, as a result (b) utilization and driver retention and hiring were being negatively affected; and that, as a result (c) U.S. Xpress's dedicated accounts, including one large account, were being negatively

12

impacted; and that, as a result (d) U.S. Xpress's OTR division was providing

continued support to the dedicated division;

(3) that: (a) U.S. Xpress failed to stay informed regarding two large liability

events; and that, as a result (b) U.S. Xpress's insurance claim expense was

understated;

(4) and that U.S. Xpress's cost per mile for driver wages and independent

contractors was exceeding the Company's internal expectations.

44.     The Offering Documents were also materially untrue and misleading because they

failed to meet the requirements of Item 303 of Regulation S-K. 17 C.F.R. § 229.303(a)(3)(ii). Item

303 requires the disclosure of known trends that have had or are reasonably expected to have a

material impact on a company's business. As set forth in detail above, all of these trends were

reasonably likely to have a negative impact on U.S. Xpress's financial condition, and thus were

required to be disclosed under Item 303.

## C.  The Truth Begins to Emerge

45.     On November 1, 2018, U.S. Xpress issued a press release, also attached as exhibit

99.1 to the Form 8-K filed with the SEC, announcing the Company's financial and operating

results for the third fiscal quarter and nine months ending September 30, 2018 ("Q3 2018 Press

Release"). Therein, U.S. Xpress stated in relevant part:

> Eric Fuller, CEO and President, commented, "We continued to see the results of
> our initiatives and cultural overhaul in the third quarter of 2018 as we experienced
> our fifth consecutive quarter of year over year improvements in our operating ratio
> while generating the largest amount of net income during a single quarter in our
> Company's history, a testament to our team's efforts and dedication. ***However, we
> are far from satisfied with our operating performance for the third quarter, as we
> believe our seated truck count and miles per tractor could have performed better
> had we executed more effectively during the quarter.*** We have taken steps
> internally to address the relevant issues and both average seated truck count and
> average miles per tractor per working day have increased in October compared with
> the third quarter.  Based on the strong freight volumes, rate environment and the

capacity currently being requested from our customers for the upcoming peak season during the fourth quarter, we feel well positioned to make 2018 the most profitable year in our history."

\* \* \*

Operating income for the third quarter of 2018 was $22.9 million which compares favorably to the $11.5 million achieved in the third quarter of 2017. This improvement was achieved despite incurring $7.6 million of incremental insurance and claims expense in the third quarter of 2018, as compared to the prior year period, partially offset by a $4.0 million gain on life insurance reflected in a reduction in salaries, wages, and benefits, or a net negative impact of approximately $0.05 to earnings per share.

\* \* \*

Mr. Fuller said, "Market conditions remained strong in the third quarter as we saw our rates increase sequentially from the second quarter and are continuing to experience further increases into the fourth quarter. Market conditions for drivers, however, remained challenging during the quarter as we were unable to increase our tractor count despite improvements in our turnover percentage. ***The modest decline was primarily due to a deceleration in the pace of hiring through the first half of the quarter which has since reversed.*** We continue to execute on our initiatives that are focused on being a valued partner to our professional drivers by offering them increased miles, modern equipment, and a driver centric operations team."

\* \* \*

The dedicated division's average revenue per tractor per week increased 5.0% in the third quarter of 2018 as compared to the third quarter of 2017. The increase was primarily the result of a 10.3% increase in the division's revenue per mile partially offset by a 4.9% decrease in the division's revenue miles per tractor per week. ***The division's results continue to be impacted by certain accounts' shipping patterns performing differently than expected which was first experienced in the second quarter of 2018.*** The Company made progress addressing the issue which resulted in a sequential improvement in utilization to a decline of 5.0% in the third quarter of 2018 from the 9.8% decline in utilization experienced in the second quarter of 2018.

Emphasis added.

46. During a conference call to discuss the Company's financial and operating results for the third fiscal quarter and nine months ending September 30, 2018 ("Q3 2018 Conf. Call"), Defendant Fuller stated in relevant part:

During the quarter, our over the road division supported contractual commitments in our dedicated division, which adversely impacted this division's utilization. Initially, we thought the support would be reduced toward the beginning of the third quarter. However, it progressively increased and peaked during the quarter. Over the last 6 weeks, the support provided to our dedicated division by our over the road division has been reduced significantly due to increased traction in our recruiting efforts to fill these dedicated positions. ***Additionally, the market for drivers remained challenging through the third quarter, which resulted in a slight decline in our average tractor count as compared to the second quarter of 2018***. ***Tractor count in our over the road division troughed in the back half of the third quarter as we experienced a slight deceleration in the pace of hiring***, which has since reversed.

Emphasis added.

47.    During the conference call, regarding insurance claims, driver wages and

independent contractor costs, Defendant Peterson stated in relevant part:

To conclude, I thought it would be helpful to provide further insight into the variance of our results relative to our expectations as you think about modeling our business looking to the fourth quarter. ***Overall, when I think about the third quarter relative to our initiatives and where we thought we would be had you asked me two quarters ago, we are essentially in line with operating income expectations with the exception of the excess insurance and claims expense we incurred during the quarter, which we consider to be $3.6 million net of the life insurance benefit.***

When developing initial expectations prior to our IPO, we analyzed our rate per mile from our customers in conjunction with our cost per mile for driver wages and independent contractors as these line items have an interdependent relationship. ***Our rates, driver wages and independent contractor costs are all higher than expectations.*** Importantly, our rate has outpaced the increase in our driver and independent contractor costs and has been a net tailwind to our financial results. ***During the quarter, tractor utilization was approximately 100 basis points lower than expected in our over the road division and around 450 basis points lower in our dedicated division***. However, a portion of this unanticipated shortfall in the dedicated utilization has been covered with incremental rate increases implemented during the third quarter. This is a component of our year-over-year increase in our dedicated division's revenue per mile of 10.3%. ***Our average tractor count was slightly lower than expected for the third quarter due to slightly lower recruiting levels than expected***. We have seen an improvement in both hiring and retention thus far in the fourth quarter, which we expect will increase our overall tractor count to levels slightly above second quarter levels. All other costs, except insurance and claims were essentially in line with expectations. Fuel and maintenance were slightly higher, while equipment and other general expenses were lower.

15

Emphasis added.

48. On this news, the price of U.S. Xpress's common stock declined from a close of $10.14 per share on November 1, 2018 to a close of $7.10 per share on November 2, 2018, *a drop of approximately 29.98%.*

49. At the date of the filing of this action, less than a year after the IPO, U.S. Xpress's common stock trades around $7.78 per share, *a decline of $8.13 per share or 50.81% from the $16 IPO public price*.

## CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired the Company's common stock pursuant or traceable to the Offering Documents issued in connection with the IPO (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

51. The members of the Class are so numerous that joinder of all members is impracticable. Following the IPO, U.S. Xpress's common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by U.S. Xpress or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Upon information and belief, these shares are held by hundreds if not

16

thousands of individuals located geographically throughout the country and possibly the world. Joinder would be highly impracticable.

52.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

53.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

54.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

    (a)     Whether the Securities Act was violated by the Defendants;

    (b)     Whether the Offering Documents contained false and misleading statements of material fact and omitted material information required to be stated therein;

    (c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

55.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## CLAIMS FOR RELIEF

## COUNT I
### *Violation of § 11 of the Securities Act Against U.S. Xpress, the Individual Defendants, and the Underwriter Defendants*

56. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

57. This Count is asserted by Plaintiff on behalf of himself and the Class against all Defendants and is based upon § 11 of the Securities Act, 15 U.S.C. § 77k.

58. The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

59. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and complete, such as to render them not false and misleading.

60. By reason of the conduct herein alleged, each Defendant violated § 11 of the Securities Act.

61. Plaintiff acquired the Company's stock pursuant and/or traceable to the IPO. Plaintiff and the Class have sustained damages. The value of the Company's stock has declined substantially subsequent to and due to Defendants' violations.

62. At the time of their purchases of the Company's stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this

18

action. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time Plaintiff commenced this action.

63.     By reason of the foregoing, Plaintiff and the other members of the Class are entitled to damages as measured by the provisions of § 11(e), 15 U.S.C. 77k(e), from the Defendants and each of them, jointly and severally.

## COUNT II
### For Violation of § 15 of the Securities Act Against U.S. Xpress and the Individual Defendants

64.     Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein. This Count is brought pursuant to § 15 of the Securities Act against U.S. Xpress and the Individual Defendants.

65.     The Individual Defendants each were control persons of the Company by virtue of their positions as directors and/or senior officers of the Company.

66.     The Individual Defendants were each culpable participants in the violation of § 11 of the Securities Act, alleged in Count I above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

67.     None of the Individual Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete in all material respects. Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

68.     This claim was brought within one year after the discovery of the untrue statements and omissions in the Offering Documents and within three years after the Company's securities were sold to the Class in connection with the IPO.

19

69.     The Company and the Individual Defendants are primarily liable, joint and severally, by reason of the above conduct pursuant to § 15 of the Securities Action, 15 U.S.C. § 77o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial.

Dated: March 8, 2019

**HOLIFIELD JANICH RACHAL FERRERA, PLLC**

/s/ *Sarah R. Johnson*
Al Holifield (BPR# 015494)
Sarah R. Johnson (BPR# 030781)
11907 Kingston Pike Suite 201
Knoxville, Tennessee 37934
Telephone: (865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com
Email: sjohnson@holifieldlaw.com

*Liaison Counsel for Plaintiff*

-and-

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (*Pro hac vice to be submitted*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com

*Counsel for Plaintiff*